## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**LAWRENCE DEMPSEY**, as
Personal Representative of the Estate
of Nicole Dempsey,

     **Plaintiff**,

v.                                   **Case No. 5:21cv134-TKW-MJF**

**TOMMY FORD,** in his official
capacity as Sheriff of Bay County,
Florida, **et al.**,

     **Defendants**.

_____/

## <u>ORDER ON SUMMARY JUDGMENT MOTIONS</u>

This case is before the Court based on Defendants' motions for summary judgment (Docs. 90, 91). Upon due consideration of the motions, Plaintiff's response in opposition (Doc. 105), Defendants' replies (Docs. 108, 109), and the more than 4,000 pages of evidence submitted by the parties (attachments to Docs. 85, 86, 100, 101, 102, 104, and 106), the Court finds that two of the defendants (Dugosh and Ford) are entitled to summary judgment but the others are not.

### Facts

Nicole Dempsey was a heavy heroine user (four injections daily for over 10 years), and she was in and out of the Bay County Jail (BCJ) numerous times between

2011 and 2019.  This case arises out of Ms. Dempsey's incarceration from April 26 to May 3, 2019.

The events giving rise to this case started on April 17, 2019, when Ms. Dempsey left the Gulf Coast Medical Center (GCMC) against medical advice.  The following day, an officer with the Panama City Police Department (PCPD) arrested Ms. Dempsey on outstanding warrants and took her to the BCJ.  When Ms. Dempsey arrived at the BCJ, medical staff suspected that she had sepsis[1] and refused to accept her into the jail, so the officer took her back to the hospital and did not maintain custody of her.  Sometime thereafter (the record is unclear precisely when), Ms. Dempsey again left the hospital against medical advice.

The following week, on April 26, a different PCPD officer responded to a drug overdose call and found Ms. Dempsey being attended to by paramedics in the driver's seat of a van.  Ms. Dempsey was taken to the hospital emergency room (accompanied by a PCPD officer), and after she was medically cleared and discharged by the emergency room, she was taken to the BCJ on her outstanding warrants.

---

[1] Sepsis is a serious medical condition in which "the body responds improperly to an infection" and "[t]he infection-fighting processes turn on the body, causing the organs to work poorly," and left untreated, sepsis can lead to "septic shock" and death. https://www.mayoclinic.org/diseases-conditions/sepsis/symptoms-causes/syc-20351214; *see also* Doc. 102-6 at 4 (explaining that "[s]eptic shock is a serious medical condition that carries a high mortality and results from a severe, systemic infection").

During the booking process at the BCJ, Ms. Dempsey told a certified medical technician (CMT) that she was not feeling well, that she was a daily intravenous heroin user and had just overdosed on heroin, that she was on antibiotics for endocarditis,[2] that she had previously had open heart surgery, and that she had high blood pressure and heart problems for which she was prescribed medications. The CMT (who is not a defendant in this case) noted that Ms. Dempsey did not present with an injury or illness that required immediate attention, and that assessment is supported by a 20-minute video of the booking area in which Ms. Dempsey does not appear to exhibit any signs of medical distress.

A licensed practical nurse (LPN), Defendant Burks, was the jail nurse assigned to Ms. Dempsey's dorm. Burks reviewed Ms. Dempsey's intake paperwork on April 27, and thus was aware of her history of endocarditis.

The following day, April 28, another jail nurse, Defendant Winters (also an LPN), checked Ms. Dempsey's vital signs during the morning shift. She observed nothing abnormal.

---

[2] Endocarditis is "a life-threatening inflammation of the inner lining of the heart's chambers and valves" which "is usually caused by an infection," and "can damage or destroy the heart valves." https://www.mayoclinic.org/diseases-conditions/endocarditis/symptoms-causes/syc-20352576; *see also* Doc. 102-20 at 11 (describing endocarditis as "a heart infection"); *United States v. Webb*, 655 F.3d 1238, 1244 (11th Cir. 2011) (noting that endocarditis is "a heart valve infection that can indicate [intravenous] drug usage"); *Defilippo v. Curtin*, 255 So. 3d 351, 354 (Fla. 4th DCA 2018) (explaining that endocarditis "is an acute bacterial infection of the inner lining of [the] heart chamber and valves").

That evening, Ms. Dempsey complained of chest pain.  She was assessed by Defendant Burks and a more experienced jail nurse, Defendant Dugosh (also an LPN) who was assigned to another dorm but accompanied Burks on her rounds in case she had any questions.

Burks and Dugosh found that Ms. Dempsey was not in need of immediate medical care, but they indicated that they would convey Ms. Dempsey's complaints to the advanced registered nurse practitioner (ARNP), Defendant Lesko.  The ARNP is "above" the jail nurses in the sense that she practiced under a collaboration agreement with the physician with whom the BCJ contracted to serve as the jail doctor, but she does not directly "supervise" the jail nurses.  Additionally, unlike the jail nurses, the ARNP has the authority to prescribe medication.

Burks and Dugosh did not complete a patient care protocol form related to their interaction with Ms. Dempsey on April 28.[3]  Dugosh thereafter had no further interaction with Ms. Dempsey.

There is no documentation showing that Burks or Dugosh contacted Lesko as they said they would, but it can be reasonably inferred that one of them did so

---

[3]  Plaintiff makes much of the fact that Burks and Dugosh did not fill out a patient care protocol as required by BCJ policy, but there is no evidence that their failure to do so caused Ms. Dempsey any harm or would have changed her course of treatment in any way—particularly since another jail nurse, Defendant Ayers (also an LPN), and Lesko both saw her the following day.

because Lesko reviewed Ms. Dempsey's records and ordered a course of treatment for her the following day, April 29.

On that date, Lesko reviewed Ms. Dempsey's intake paperwork and the discharge report from the emergency room. The discharge report did not mention endocarditis, but the intake paperwork did. The discharge report did, however, recommend that Ms. Dempsey return to the emergency room immediately upon "any recurrence of difficulty breathing, chest pain, shortness of breath, … nausea or vomiting, [or] abdominal pain."

Lesko did not send Ms. Dempsey to the hospital based on her complaints of chest pain to Burke and Dugosh the night before. She did, however, order additional blood pressure and pulse checks on Ms. Dempsey and prescribed a medication, Coreg, for her high blood pressure.

Ayers saw Ms. Dempsey during the morning shift on April 29 and took her vital signs. Later that day, after Ms. Dempsey again complained of chest pain, correctional officers contacted Ayers. Ayers did not perform a physical assessment of Ms. Dempsey, but rather merely relayed to the officers that Lesko had prescribed Coreg and monitoring.

In the early morning hours of April 30, jail nurse Toni Paramore (who is not a defendant in this case) responded to a "sick call" by Ms. Dempsey in which she requested to be seen because of "Endocarditis Gulf Coast Hospital." Paramore

completed a chest pain protocol sheet indicating that Ms. Dempsey had experienced tight, squeezing chest pain all day, that she had swelling in her hands and pitting edema in both lower extremities, and that she was experiencing shortness of breath. Paramore contacted Lesko, who ordered Lasix for the edema, a one-time dosage of clonidine for the high blood pressure, and an albuterol nebulizer treatment for the shortness of breath.

During the day shift on April 30, Ms. Dempsey was seen by Lesko and another nurse. Lesko noted Ms. Dempsey's high blood pressure, pitting edema in both lower extremities, and wheezing and rhonchi in both lungs. Ms. Dempsey informed Lesko that she was given antibiotics for endocarditis at GCMC and that she had left the hospital against medical advice.[4]

Lesko ordered a chest x-ray of Ms. Dempsey, which revealed left lung airspace disease, but she did not send Ms. Dempsey to the hospital because she did not believe that she was in acute distress or in need of emergency medical care at that time.

---

[4] There is conflicting evidence as to whether Lesko had access to Ms. Dempsey's GCMC records prior to her death. Lesko claims that she did not receive Ms. Dempsey's medical records pertaining to her discharge against medical advice from GCMC until May 21, 2019. Plaintiff contends that Lesko's "see records" note on Ms. Dempsey's medical appraisal form, *see* Doc. 102-1 at 31, shows otherwise. Plaintiff also argues that Lesko had access to those records through an online application, PatientKeeper, as early as April 26. Irrespective, it is undisputed that by at least April 30, Lesko knew that Ms. Dempsey had been diagnosed with endocarditis.

On May 1, Winters and Burks provided Ms. Dempsey the medications ordered by Lesko, and Winters recorded Ms. Dempsey's vital signs.  The vital signs were in within the normal range, but Ms. Dempsey continued to complain of chest pain and trouble breathing that day.

Inmate Megan Scelfo[5] testified that on that day (and the following day), Ms. Dempsey was visibly disoriented and that she was walking around the dorm wearing no pants or shoes.  There is also evidence that Ms. Dempsey vomited, urinated, and defecated in her bed and had to be cleaned up by other inmates.  Other inmates also relayed to unnamed officers and medical staff their concerns that Ms. Dempsey needed medical attention, and Scelfo testified that it was obvious to her and the other inmates that Ms. Dempsey needed medical attention.

That night, Burks twice checked Ms. Dempsey's vital signs and administered the medications ordered by Lesko.  Ms. Dempsey filed another sick call request for "trouble breathing" and "endocarditis," but Burks did not complete any paperwork related to that sick call request or take any further action because Ms. Dempsey apparently wanted to be seen by the ARNP instead of Burks.

---

[5] Defendants objected to Scelfo's affidavit (Doc. 106-1) on the basis that it contradicts her deposition testimony (Doc. 102-14) regarding whether Ms. Dempsey received medical treatment. The Court does not read the affidavit to be saying that Ms. Dempsey did not receive any medical attention and treatment (which she undisputedly did); rather, the affidavit merely says that Ms. Dempsey was not taken to the medical unit or the hospital on May 1 or 2, *see* Doc. 106-1 at ¶12, which is consistent with Scelfo's deposition testimony and the other record evidence describing Ms. Dempsey's time at the BCJ.

On May 2, Winters checked Ms. Dempsey's vital signs, which were within the normal range.  Winters also addressed the outstanding sick call request from the night before by writing a note on the sick call request form, stating:  "you have been seen by ARNP for this already and were given meds give them time to work you just started and took two doses.  You have a follow-up with ARNP in a few days."

Video from the jail from the early morning of May 3 shows Ms. Dempsey appearing visibly disoriented and walking around the dorm with no pants or shoes.  Later that morning around 8:40 a.m., a correctional officer alerted Ayers that Ms. Dempsey appeared to be in medical distress because she was unable to sit up on her own and she had been lying in her own urine and feces all night.  Ayers checked Ms. Dempsey's vital signs, which reflected an elevated heart rate of 120.  Ayers also noted that Ms. Dempsey appeared weak and that her breathing was rapid and labored.  Despite this, Ayers did not arrange for Ms. Dempsey to be taken to the hospital.  Instead, she contacted Lesko (who was not physically present at the jail that day) and Lesko ordered that Ms. Dempsey be hydrated, given Imodium, and have an EKG taken.

Ms. Dempsey was taken to the medical unit for additional evaluation.  More than an hour later, around 10:00 a.m., after observing no improvement in Ms. Dempsey's condition, jail nurse Rachel Smith (who is not a defendant in this case)

determined that Ms. Dempsey required immediate attention and requested that she be transported to the GCMC emergency room.

Ms. Dempsey was transported to GCMC by ambulance at approximately 10:30 a.m. There, she was diagnosed with septic shock and respiratory failure, along with additional conditions (pneumonia and abscesses on her kidneys and spleen) caused by the sepsis.

Two days later, on May 5, Ms. Dempsey died at GCMC. The cause of death was listed as endocarditis due to chronic drug use, with additional contributing factors.

The treatment of endocarditis requires a course of antibiotics, typically administered intravenously in a hospital setting. Ms. Dempsey was not given any antibiotics while she was at the BCJ between April 26 and May 3, 2019.

Plaintiff's medical expert opined that Ms. Dempsey would have likely survived if she had been taken to the hospital sooner. Defendants' medical expert opined that Ms. Dempsey would have died from her medical condition irrespective of whether she was taken to the hospital sooner.

Ms. Dempsey was 33 years old at the time of her death. She is survived by two minor children.

**Procedural History**

Plaintiff (Ms. Dempsey's father) was appointed as the personal representative of her estate, and in April 2021, he filed suit against the Bay County Sheriff (Sheriff Ford) alleging, among other things,[6] that the Sheriff's deliberate indifference to Ms. Dempsey's serious medical needs caused her death. Sheriff Ford removed the case to this Court in July 2021 based on federal question jurisdiction because the deliberate indifference claim was asserted under 42 U.S.C. §1983.

Plaintiff thereafter amended the complaint to add deliberate indifference claims against Ayers, Burks, Dugosh, Lesko, and Winters (collectively, "the Nurse Defendants"). The now-operative second amended complaint (Doc. 59) asserts six deliberate indifference claims (one against each defendant) under §1983. Defendants denied the claims and asserted various affirmative defenses. *See* Docs. 63 through 68.

The parties engaged in an extended period of discovery, which closed in November 2022. Thereafter, Defendants filed motions for summary judgment.[7] The motions were fully briefed (with over 170 pages of briefing) and are ripe for rulings. No hearing is necessary to rule on the motions.

---

[6] The complaint also alleged state law claims against Sheriff Ford, but the Court dismissed those claims. *See* Doc. 28.

[7] Defendants also filed *Daubert* motions to exclude the testimony of Plaintiff's medical expert and jail practices expert. The Court separately denied those motions. *See* Doc. 110.

10

## Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is "material" if it would change the outcome of the litigation, and a dispute about a material fact is "genuine" if the evidence as a whole could lead a reasonable factfinder to find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Once the moving party meets that burden, the non-movant must go beyond the pleadings and identify evidence of record showing a genuine factual dispute for trial.  *Id.*

When reviewing a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-moving party.  *Pennington v. City of Huntsville*, 261 F.3d 1262, 1265 (11th Cir. 2001).  The Court's role at the summary judgment stage is not to weigh the evidence, but rather to "conclude whether [the evidence] is so one-sided that the result of any trial is inevitable."  *Turner v. Phillips*, 2022 WL 458238, at *4 (11th Cir. Feb. 15, 2022).

**Analysis**

The Fourteenth Amendment requires government officials to provide necessary medical care to pretrial detainees, and the failure to do so is actionable under §1983. *Ireland v. Prummell*, 53 F.4th 1274, 1287 (11th Cir. 2022). The applicable legal standard (which is discussed more fully below) includes a subjective component, so each defendant must be "judged separately and on the basis of what that person knows." *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008). Thus, the claims against each defendant will be separately assessed, starting with the claims against the Nurse Defendants.

<u>Claims Against the Nurse Defendants (Counts II through VI)</u>

Plaintiff claims that each Nurse Defendant was deliberately indifferent to her serious medical needs. To prove this claim, Plaintiff

> must shoulder three burdens. First, she must satisfy the objective component by showing that she had a serious medical need. Second, she must satisfy the subjective component by showing that the prison official acted with deliberate indifference to her serious medical need. Third, as with any tort claim, she must show that the injury was caused by the defendant's wrongful conduct.

*Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326 (11th Cir. 2007) (internal citations omitted). Here, Defendants' motions focus only on the first two elements, so the Court need not consider the issue of causation at this stage of the case.[8]

---

[8] That said, to establish causation, it likely will not be enough for Plaintiff's medical expert to say (as she did in her reports) that Ms. Dempsey should not have been admitted into the BCJ in the first place and that she would likely have survived "had she been promptly sent back to the

*Objective Component*

"A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009) (internal quotations omitted); *see also Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (explaining that a serious medical need is "one that, if left unattended, poses a substantial risk of serious harm" (cleaned up)).

Here, the parties appear to agree that—and there is evidence from which a jury could find that—endocarditis and sepsis both qualify as objectively serious medical needs. And, although there is some dispute about the difference between acute endocarditis, chronic endocarditis, and having a history of endocarditis, there is considerable evidence that Ms. Dempsey was in fact suffering from endocarditis (and, possibly, sepsis) between April 26 and May 3, 2019.

---

hospital on <u>April 26</u>, 2019." Doc. 86-3 at 11 (emphasis added); *accord id.* at 16-17, 24. None of the Nurse Defendants had any role in Ms. Dempsey's admission into the jail, and because there is no evidence that the Nurse Defendants had any contact with Ms. Dempsey until April 27 or later, it is hard to see how Plaintiff will be able establish that the Nurse Defendants' alleged deliberate indifference to Ms. Dempsey's medical needs after her admission was the legal cause of her death absent expert testimony that Ms. Dempsey would have likely survived if she had been taken to the hospital or received different treatment at some point after April 26 and before May 3. And, on that issue, it is unclear whether Plaintiff's medical expert offered a firm opinion. *See* Doc. 102-20 at 66-67 (opining only that Ms. Dempsey's chance of survival "would have been better" had she gone back to the hospital on April 29 instead of May 3); *id.* at 69 (opining that Ms. Dempsey's chance of survival was "significantly decreased" because she went back to the hospital on May 3 rather than April 29).

The Court did not overlook Defendants' argument that there was no evidence that Ms. Dempsey had an objectively serious medical need prior to the time that she was taken to the emergency room on May 3.  This argument is meritless because there is ample evidence (including her continued complaints about chest tightness and difficulty breathing, as well as the lay observations from other inmates about Ms. Dempsey's medical distress) from which a jury could find that Ms. Dempsey was exhibiting symptoms of endocarditis (and, possibly, sepsis) and needed to go to the emergency room well before she was finally taken on May 3.  Moreover, Defendants' arguments on this point focus more on their knowledge or awareness of the serious nature of Ms. Dempsey's medical condition rather than the existence of the condition—which is more relevant to the subjective component of the analysis.

Accordingly, at this stage of the case, Plaintiff has met his burden to establish the objective element of his deliberate indifferent claims.

*Subjective Component*

"The subjective inquiry requires a plaintiff to prove that a government official was 'deliberatively indifferent' to [the serious medical] need." *Ireland*, 53 F.4th at 1287.  The "deliberate indifference" inquiry includes four elements:  "(1) the official 'was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' (2) the official 'actually drew that inference,' (3) the official 'disregarded the risk of serious harm,' and (4) the official's 'conduct amounted to

more than gross negligence.'" *Id.* (quoting *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015)).

The Nurse Defendants argue that Plaintiff cannot establish any of these elements.  The Court disagrees.

The first and second elements are interrelated and essentially ask whether the defendant had actual subjective knowledge of the risk of harm.  "Whether [the defendant] had the requisite awareness of the risk 'is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'"  *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)).

Here, there is evidence from which a reasonable jury could find that, at different points between April 27 and May 3, Burks, Lesko, Winters, and Ayers each subjectively knew that Ms. Dempsey had a serious medical condition that needed emergency care.  However, there is no such evidence with respect to Dugosh.

With respect to Burks, there is evidence from which a jury could find that as of at least May 1 (and possibly as early as April 27), she was aware that Ms. Dempsey was suffering from endocarditis and needed emergency medical care. Specifically, on April 27, Burks reviewed Ms. Dempsey's intake paperwork, which indicated that she had endocarditis and had been taking antibiotics for that condition

15

prior to her arrest; on April 28, she responded to Ms. Dempsey's initial complaint of chest pain (a symptom of endocarditis); and in the evening of May 1 (the same day that, according to other inmates, Ms. Dempsey began to appear disoriented in her dorm), Burks received Dempsey's sick call request specifically complaining of "trouble breathing" and "endocarditis."

With respect to Lesko, there is evidence from which a jury could find that as of at least April 29, she was aware that Ms. Dempsey had been diagnosed with endocarditis and that the discharge report from the emergency room recommended that she return to the emergency room if the symptoms (including chest pains about which she had complained the day before) recurred.  There is also evidence that Lesko was aware that Ms. Dempsey continued to complain about endocarditis symptoms because, on April 30, after Lesko spoke with Nurse Paramore about Ms. Dempsey's ongoing complaints of chest pain, shortness of breath, and pitting edema, Lesko saw Ms. Dempsey and she reported that she had been taking antibiotics for endocarditis prior to her arrest.

With respect to Winters, there is evidence from which a jury could find that as of at least May 2, she was aware that Ms. Dempsey was suffering from a serious medical condition.  Specifically, on that date, Winters received a sick call from Ms. Dempsey complaining about conditions ("trouble breathing" and "endocarditis") for which Winters was aware that she had been prescribed medications.

16

With respect to Ayers, there is evidence from which a jury could find that she knew on May 3 that Ms. Dempsey needed to be sent to the hospital immediately rather than being sent to the medical unit to be monitored. Specifically, Ayers responded to a report from a correctional officer that Ms. Dempsey was in medical distress because she could not sit up on her own and she had been lying in her own excrement all night, and Ayers observed that Ms. Dempsey appeared weak and that her breathing was rapid and labored.

By contrast, with respect to Dugosh, there is no evidence from which a jury could find that she was aware that Ms. Dempsey had a serious medical condition that needed emergency medical care. Dugosh only had one encounter with Ms. Dempsey, in the evening of April 28 after Ms. Dempsey's first complaint of chest pain. Dugosh was responsible for another dorm at the BCJ and was merely accompanying the nurse (Burks) responsible for Ms. Dempsey's dorm. There is no evidence that Dugosh was aware of Ms. Dempsey's underlying medical conditions at that time, nor is there any evidence that Ms. Dempsey told Dugosh that she was suffering from endocarditis or any other condition that would have put her on notice that Ms. Dempsey's complaints of chest pain might be a sign that she required emergency medical treatment.

In sum, there is sufficient evidence from which a jury could infer that each of the Nurse Defendants except for Dugosh was subjectively aware that Ms. Dempsey

17

was suffering from a serious medical condition that required emergency medical care sooner than she was transported to the hospital. *See McElligott v. Foley*, 182 F.3d 1248, 1256 (11th Cir. 1999) (explaining that a jury could infer that the defendants were aware that the inmate "was vitally in need of medical treatment to address his pain" (and, thus, they were aware of a substantial risk of harm to the inmate) based on the inmate' constant complaints about pain, defendants' notes from their examinations of the inmate reflecting that he was in pain, and external notifications to defendants of the need to look into the inmate's care,); *Carswell v. Bay Cnty.*, 854 F.2d 454, 457 (11th Cir. 1988) (explaining that the defendants were subjectively aware of the inmate's need for medical care based on warnings from other members of the jail staff, requests for medical attention from the inmate himself and from his lawyer, and the fact that they observed the inmate in his deteriorating condition).

The Court did not overlook Plaintiff's argument that all the Nurse Defendants should have known of Ms. Dempsey's serious medical condition based on their ability to access her intake paperwork, prior jail records, or other external medical records, even if they did not actually do so. However, even if Nurse Defendants had access to those records (and the record does not clearly establish that they did), this argument is unpersuasive because the subjective inquiry focuses on what each defendant actually knew, not what a defendant "should have known." *See Farmer*,

511 U.S. at 843 n.8 ("[C]ourts should be careful to ensure that the requirement of subjective culpability is not lost.  It is not enough merely to find that a reasonable person would have known, or that the defendant should have known …."); *Burnette*, 533 F.3d at 1331 ("[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference.").

The third and fourth elements of the subjective inquiry are related, and in the context of a claim of deliberate indifference to serious medical needs, ask whether the defendants, in light of their subjective knowledge at the time, took a course of action that amounts to more than gross negligence with respect to those needs.

"[K]nowledge of the need for medical care and an intentional refusal to provide that care constitutes deliberate indifference." *Adams v. Poag*, 61 F.3d 1537, 1543 (11th Cir. 1995).  As does providing "grossly inadequate" or "cursory" medical care or "deci[ding] to take an easier but less efficacious course of treatment." *See McElligott*, 182 F.3d at 1255; *Mandel v. Doe*, 888 F.2d 783, 789 (11th Cir. 1989); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989).  Moreover, "[e]ven where medical care is ultimately provided, a prison official may nonetheless act with deliberate indifference by delaying the treatment of serious medical needs, even for a period of hours," *McElligott*, 182 F.3d at 1255, depending on "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay," *Goebert*, 510 F.3d at 1327.

Here, there is evidence from which a reasonable jury could find that the medical care provided by each of the Nurse Defendants except Dugosh was grossly inadequate, cursory, and/or unduly delayed.  Specifically, there is evidence that Burks, Lesko, Winters, and Ayers failed to timely send Ms. Dempsey to the hospital before May 3 despite knowing she had endocarditis and was continuing to experience endocarditis-related symptoms, and despite the fact that her need for emergency medical care was apparent to even lay inmates; that they did not administer antibiotics or other medication to mitigate the life-threatening underlying problems (endocarditis and sepsis), but rather focused solely (and unsuccessfully) on alleviating some of the symptoms (high blood pressure and shortness of breath); that Ayers and Winters essentially ignored Ms. Dempsey's requests for medical attention by not physically examining her in response to her sick call requests on April 29 and May 2, respectively; that Lesko failed to contact the jail doctor at any point to address Ms. Dempsey's continuing complaints; and that Ayers and Lesko did not immediately send Ms. Dempsey to the emergency room on May 3 despite the fact that her breathing was rapid and labored and a correctional officer informed Ayers that Ms. Dempsey had been lying in her own urine and feces all night.

By contrast, with respect to Dugosh, there is no evidence from which a jury could find that she provided grossly inadequate care or was otherwise deliberately indifferent to Ms. Dempsey's serious medical needs.  Dugosh only had one

20

encounter with Ms. Dempsey in the evening of April 28. Although Ms. Dempsey complained about chest pain, her vital signs were normal and she was not exhibiting any signs of being in medical distress, and there is no evidence that Dugosh was aware that Ms. Dempsey had previously been diagnosed with endocarditis. Thus, based on the information she was aware of at the time, no reasonable jury could find that Dugosh acted with deliberate indifference to Ms. Dempsey's medical condition by referring her to the ARNP for the following day. *See, e.g.*, *Race v. Bradford Cnty.*, 2020 WL 8224839, at *5 (M.D. Fla. Dec. 11, 2020) (defendant did not meet standard for deliberate indifference when she only had a single encounter with the inmate, who was not experiencing or complaining of life-threatening symptoms at the time, and she took some action to help the inmate, including contacting a doctor and obtaining authorization to get the inmate medicine); *Bruno v. United States*, 2019 WL 2719803, at *6 (N.D. Fla. May 30, 2019) (defendant was not deliberately indifferent for failure to provide additional treatment based on one encounter with the inmate, during which the inmate was not exhibiting any physical manifestations of an illness), *report and recommendation adopted*, 2019 WL 2717973 (N.D. Fla. June 28, 2019).

The Court overlook the Nurse Defendants' argument that Ms. Dempsey was seen by medical staff daily and that she was continuously provided medications and other treatment. It is true that, generally, "[w]here a prisoner has received … medical

attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims that sound in tort law." *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (1st Cir. 1981)). However, it is also well-established that "[t]he mere fact that medical care is eventually provided is insufficient to defeat a claim for deliberate indifference" because "[a]n official may still act with deliberate indifference 'by delaying the treatment of serious medical needs.'" *Ireland*, 53 F.4th at 1287-88 (quoting *McElligott*, 182 F.3d at 1255). Likewise, it is well-established that a plaintiff may prove deliberate indifference by showing that an official decided to take an easier but less efficacious course of treatment or that the care that was provided was grossly inadequate under the circumstances. *See McElligott*, 182 F.3d at 1255; *Waldrop*, 871 F.2d at 1033. Thus, the undisputed fact that some care was provided to Ms. Dempsey is not dispositive.

Here, there is evidence from which a jury could find that the Nurse Defendants acted with deliberate indifference because they delayed getting Ms. Dempsey the emergency medical care that she needed based on the endocarditis symptoms that she continued to exhibit despite the medications that she was being given for those symptoms. *See, e.g.*, *Paulk v. Ford*, 826 F. App'x 797, 805-06 (11th Cir. 2020) (reversing order granting summary judgment in favor of jail doctor because there

was evidence from which a jury could find that the doctor disregarded a substantial risk of serious harm to inmate by only prescribing medication for symptoms and doing little or nothing to actually treat the underlying life-threatening condition causing the inmate's deteriorating state); *McElligott*, 182 F.3d at 1257 (holding that in light of inmate's repeated complaints of severe abdominal pain the defendants were deliberately indifferent by letting the inmate's condition deteriorate and doing nothing to alleviate his pain other than giving him Tylenol, Pepto-Bismol, and anti-gas medication, which under the circumstances was "so cursory as to amount to no care at all" and represented the defendants' knowing choice to take an "easier but less efficacious course of treatment," particularly given that "[e]ven the care they did provide often came after significant delays"); *Carswell*, 854 F.2d at 457 (holding that defendants were deliberately indifferent when they "did nothing significant to ensure that [the inmate] received medical attention" despite his deteriorating condition, his specific requests for medical attention, and warnings from other jail staff that medical attention was needed); *Christmas v. Rodriguez-Colon*, 2021 WL 4033284, at *10 (M.D. Fla. Sept. 3, 2021) (holding that jail doctor was deliberately indifferent when, despite inmate's recent colostomy and ventral hernia, he gave the inmate only Tylenol for his severe abdominal pain and disregarded the inmate's numerous requests for more pain medicine and attention to his colostomy and hernia-related problems as his symptoms worsened).  Specifically, Burks and Lesko both

knew from Ms. Dempsey's intake paperwork that she had endocarditis and there is evidence that Lesko was also aware that Ms. Dempsey's emergency room discharge reports recommended that she return to the hospital if she experienced chest pain, difficulty breathing, or shortness of breath, but they did not send her to the hospital even after she continued to experience those symptoms; on separate occasions, Ayers and Winters each refused to see Ms. Dempsey despite her complaints of chest pains and/or shortness of breath; and at Lesko's direction, Ayers sent Ms. Dempsey for additional monitoring rather than immediately to the hospital on the morning of May 3 despite seeing her labored breathing and being told by a corrections officer that she was unable to sit up on her own and had been lying in her own urine and feces all night.

Accordingly, at this stage of the case, Plaintiff has met his burden to establish the subjective component of his deliberate indifferent claims with respect to each Nurse Defendant, except Dugosh.

*Qualified Immunity*

The Nurse Defendants argue that even if there was evidence from which a jury could find that they were deliberately indifferent, they are entitled to summary judgment based on the doctrine of qualified immunity.  The Court disagrees.

"[A] government official is entitled to qualified immunity 'unless he (1) violated a constitutional right, and (2) that constitutional right was clearly

established at the time.'"  *Ireland*, 53 F.4th at 1297 (quoting *Bradley v. Benton*, 10 F.4th 1232, 1238 (11th Cir. 2021)).  "The standard for determining whether a right is well-established for purposes of qualified immunity is whether the right violated is one about 'which a reasonable person would have known.'"  *Goebert*, 510 F.3d at 1329 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A government official can be on notice of a constitutional right based on "factually similar cases already decided by state and federal courts in the relevant jurisdiction."  *Id.* at 1330; *see also King v. Pridmore*, 961 F.3d 1135, 1145 (11th Cir. 2020) ("[F]or the law to be clearly established to the point that qualified immunity does not protect a government official, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.") (quoting *Hudson v. Hall*, 231 F.3d 1289, 1294 (11th Cir. 2000)).

The parties agree that, as a general matter, the law was clearly established in April 2019 that knowledge of the need for medical care and intentional refusal to provide that care constituted deliberate indifference.  *See Harris v. Coweta County,* 21 F.3d 388, 393 (11th Cir. 1994).  However, the Nurse Defendants argue that the law was not clearly established that their acts and omissions in this case violated federal law because the Eleventh Circuit had not applied that principle in a case involving material similar circumstances as this case.  The Court disagrees.

25

For example, in *McElligott*, an inmate had been experiencing abdominal pains for several months at the time he was booked into the jail. 182 F.3d at 1251. Once incarcerated, the inmate consistently complained of severe abdominal pain and repeatedly requested additional treatment, but was given only Pepto-Bismol, Tylenol, and an anti-gas medication, which did nothing to alleviate his pain. *Id.* at 1252-53. Moreover, despite examining the inmate and observing his worsening condition, jail staff did not send him to the hospital until more than a week later, and the inmate was eventually diagnosed with terminal cancer. *Id.* at 1254. Under those circumstances, the Eleventh Circuit held that there were facts from which a jury could find that jail medical staff were deliberately indifferent to the inmate's serious medical needs because, despite their knowledge that the inmate's condition was deteriorating and that the medications they were prescribing were ineffective, they did nothing to treat the inmate's pain or respond to his deteriorating condition, but rather provided only cursory care and took an easier but less efficacious course of treatment. *See id.* at 1257-58.

Similarly, in *Carswell*, the inmate complained of rash, constipation, and significant weight loss and repeatedly requested additional medical attention, and jail staff could see that the inmate's condition was visibly deteriorating. 854 F.2d at 455. The inmate received some treatment, but on other occasions was ignored by the jail staff, and when he appeared in court, the public defender noted that he

26

"looked like a concentration camp victim." *Id.* The jury found in favor of the inmate and the Eleventh Circuit upheld the jury's verdict, concluding that a jury could find deliberate indifference because jail staff knew of the inmate's medical problems and his weakening condition, but despite the inmate's requests for additional care, they did nothing significant to ensure that he received the medical attention that he needed. *See id.* at 457.

Finally, in *Ancata v. Prison Health Services, Inc.*, the inmate began to suffer from a variety of medical symptoms during his incarceration, but despite his complaints, jail medical staff "did little or nothing to evaluate [his] medical needs," but rather only administered non-prescription medications and refused to refer him for a more comprehensive evaluation. 769 F.2d 700, 702 (11th Cir. 1985). After court orders compelled evaluations by an orthopedic specialist and a neurologist, the inmate was sent to the hospital and diagnosed with leukemia, and he died soon thereafter. *Id.* The Eleventh Circuit reversed the district court's dismissal as to the medical defendants, concluding in relevant part that their delay in providing necessary medical treatment and the cursory nature of the treatment they did provide, if proven, would constitute deliberate indifference. *See id.* at 704.

Although these cases did not involve identical facts, that is not required. *See Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1277 (11th Cir. 2004) (explaining that "there need not be a case 'on all fours,' with materially identical

facts" to overcome qualified immunity).  The material facts of this case (construed in the light most favorable to Plaintiff)—e.g., that the Nurse Defendants knew at different points that Plaintiff had endocarditis and that they did not send her to the hospital for treatment despite the fact that she continued complain about chest pian, trouble breathing, and other symptoms related to that condition—are sufficiently similar to the circumstances of those cases such that they (if not others) provided the Nurse Defendants "fair warning" that their treatment of Ms. Dempsey in this case was constitutionally deficient.  *See McElligott*, 182 F.3d at 1260 ("Qualified immunity is a guarantee of fair warning.").

*     *     *

In sum, for the reasons stated above, the Court finds that Dugosh is entitled to summary judgment, but the other Nurse Defendants are not.

Claim Against Sheriff Ford (Count I)

Plaintiff's §1983 claim against Sheriff Ford in his official capacity is effectively a suit against Bay County.  *See Kentucky v. Graham*, 473 U.S. 159, 165 (1985); *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  To prevail on this claim, Plaintiff must show "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).  "'A policy is a decision

28

that is officially adopted by the [governmental entity], or created by an official of such rank that he or she could be said to be acting on behalf of the [governmental entity]' while '[a] custom is a practice that is so settled and permanent that it takes on the force of law.'"  *Ireland*, 53 F.4th at 1289 (quoting *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997)).

Here, Sheriff Ford argues that Plaintiff has not shown that he had a custom or policy of deliberate indifference to the serious medical needs of detainees in the BCJ.[9]  The Court agrees.

The precise custom or policy that Plaintiff claims to exist in this case is not entirely clear.  The complaint generally referred to the jail having a policy or custom of "failing to take action to obtain emergency medical care for inmates," "refusing medical care despite knowledge of their need for treatment," and "being callously indifferent to inmates' medical needs," *id.* at ¶¶70, 75, but Plaintiff's summary judgment briefing focuses only on the jail nurses' alleged unchecked delegated authority to decide what medical treatment to provide, *see* Doc. 105 at 34-36—which is consistent with how the *Monell* claim was argued at the motion to dismiss stage, *see* Doc. 28 at 14-18.

---

[9]   The Sheriff also argued that Plaintiff's constitutional rights were not violated, but as discussed above, there is evidence from which a jury could find that four of the Nurse Defendants were deliberately indifferent to Ms. Dempsey's serious medical needs.

There is no evidence from which a jury could find that Sheriff Ford had a custom or policy of failing to provide care to inmates or being deliberately indifferent to inmates' medical needs.  Indeed, the undisputed evidence shows that the BCJ had numerous policies requiring that inmates receive adequate medical care. *See, e.g.*, Doc. 85-24 at 1 (policy requiring jail officials to "provid[e] unimpeded quality, accessible health services to all inmates."); Doc. 85-25 (policy requiring that "[e]very inmate … have access to health care services from admission to discharge from the facility"); Doc. 85-26 (policy providing for a sick call system so that "an inmate with a health care request will have unimpeded access to individualized and appropriate health care for non-emergency illness or injury in a clinical setting"); Doc. 85-13 (protocol for providing 24/7 emergency medical care, including transportation to an external medical facility when necessary); Doc. 85-18 (protocol for initial intake medical and mental health screenings); Doc. 85-19 (protocol for creating and maintaining a medical file for each inmate); Doc. 85-20 (protocol for providing medication to inmates as necessary).

Likewise, there is no evidence from which a jury could find that the jail nurses were allowed to function without supervision or review.  Indeed, the evidence shows that under jail policy, Sheriff Ford "retains control of all tasks and duties"; that the jail doctor "ha[s] the primary responsibility to determine the proper course of treatment in medical cases" and has final clinical judgment; that the jail doctor has

the authority to (and does) supervise Lesko's practice as an ARNP; and that the Health Services Administrator (David Sasser) oversees all medical care on a daily basis.

Plaintiff points to no contrary evidence on either point, and the mere fact that there is evidence from which a jury could find that four of the Nurse Defendants were deliberately indifferent to Ms. Dempsey's serious medical needs over the course of a week is not evidence of the existence of a custom or practice of deliberate indifference. *See Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1311 (11th Cir. 2011) ("A single incident of a constitutional violation is insufficient to prove a policy or custom even when the incident involves several employees of the municipality.").

The Court did not overlook Plaintiff's argument that the delegation of authority to the jail nurses to make medical decisions makes them final policymakers such that the County is liable for a single incidence of unconstitutional conduct of the Nurse Defendants . However, to hold a municipality liable on this theory, "the delegation must be such that the subordinate's discretionary decisions are not constrained by official policies and are not subject to review." *Mandel*, 888 F.2d at 792; *see also Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997) (explaining that there is no municipal liability for a subordinate official's actions "when the final policymaker delegates decisionmaking discretion to the subordinate, but retains the power to review the exercise of that discretion"). Moreover, "[s]imply

31

going along with discretionary decisions made by one's subordinates ... is not a delegation to them of the authority to make policy." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 130 (1988).

Here, the fact that Sheriff Ford has a chain of subordinates who exercise discretion in carrying out their role of providing medical care to inmates does not mean that he delegated to them the authority to make policy such that they could be considered final policymakers. *Id.*; *see also Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1050 (11th Cir. 2014) (holding that a Sheriff cannot be held liable for relying on trained medical personnel to make medical decisions). Moreover, the evidence shows that the individuals in the chain of command, all the way up to the Sheriff, retained the authority to review discretionary decisions made by the medical staff and intervene when necessary, and there is no evidence (only Plaintiff's bald assertions and speculation) that this review authority was abdicated. *See Scala*, 116 F.3d at 1399.

In sum, although there is evidence that the Nurse Defendants exercised their own medical judgment as they performed their day-to-day duties and that they were not required to check with a superior before making many decisions pertaining to an inmate's care, there is no evidence that the individuals who Plaintiff alleges violated Ms. Dempsey's constitutional rights exercised unfettered and unreviewed discretion on any matters—particularly not matters of policy. This, coupled with the absence

32

of evidence showing any official policy or longstanding practice or custom of deliberate indifference to the serious medical needs of inmates at the BCJ, means that there is no basis to impose liability on Sheriff Ford in this case.[10]

Accordingly, Sheriff Ford is entitled to summary judgment.

## Conclusion

In sum, for the reasons stated above, the Court finds that the Sheriff Ford and Defendant Dugosh are entitled to summary judgment, but the other defendants are not.  Accordingly, it is **ORDERED** that:

1.     Defendant Dugosh's motion for summary judgment (Doc. 91) is **GRANTED**.

2.     The other defendants' motion for summary judgment (Doc. 90) is **GRANTED in part** (with respect to the claim against Sheriff Ford) and **DENIED in part** (with respect to the claims against Defendants Ayers, Burks, Lesko, and Winters).

---

[10]   Based on this conclusion, the Court need consider Defendants' argument that the depositions of BCJ Warden Rick Anglin (Doc. 102-16) and Health Services Administrator Sasser (Doc. 102-18) should be stricken because the depositions were taken in a case involving a 2014 incident at the BCJ and have no bearing on the policies and customs in effect at the time of the 2019 events involving Ms. Dempsey.  That said, it is noteworthy that Warden Anglin testified in his deposition that he retained the authority to intervene in matters of inmate care, *see* Doc. 102-16 at 17-18, which undermines Plaintiff's argument that Sheriff Ford can be liable here because he delegated final policymaker authority to the members of the nurses who allegedly violated Ms. Dempsey's constitutional rights.

3.      The claims in the second amended complaint against Sheriff Ford (in Count I) and Defendant Dugosh (in Count IV) are **DISMISSED with prejudice**, and the Clerk shall terminate them as defendants in CM/ECF.

4.      Within 7 days from the date of this Order, the remaining parties shall confer and provide the Court several mutually agreeable dates and times over the next two weeks for a telephonic case management conference to set this case for trial.

**DONE and ORDERED** this 21st day of February, 2023.

_____
**T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**

34